John B. BALENTINE, Appellant,

v.

STATE of Alaska, Appellee.

No. A–381.

Court of Appeals of Alaska.

Oct. 17, 1985.

**924**

Sen K. Tan, Asst. Public Defender, and Dana Fabe, Public Defender, Anchorage, for appellant.

Cynthia M. Hora, Asst. Atty. Gen., Anchorage, and Norman C. Gorsuch, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and SINGLETON, JJ.

## OPINION

COATS, Judge.

Johnny B. Balentine was indicted for first-degree murder, AS 11.41.100(a)(1), and convicted of second-degree murder after a jury trial. AS 11.41.110. At trial, Balentine admitted shooting John Wortham. He claimed, however, that he had done so in self-defense.

Balentine raises four issues on appeal. First, he contends the hearsay statement of a witness to the shooting who was unavailable at trial should have been allowed into evidence. Second, he contends he should have been allowed discovery of the records of the anonymous "Crime Stoppers" tips that the police received concerning the shooting incident. Third, he contends the trial court erred in refusing to instruct the jury on imperfect self-defense. Finally, he raises the unanimous acquittal transitional jury instruction issue, arguing that the court erred in instructing the jury that they could not consider lesser-included offenses unless they first unanimously found the defendant not guilty of the greater charge. We affirm Balentine's conviction.

On the afternoon of June 5, 1984, Balentine, his girlfriend Kelly Hamlin, their children, Tom Fleming, Barbara Fleming, and others, were having a home barbecue at Woodside Village. From there, some of the group went to a nearby basketball court so the men could play basketball. On the way, Tom Fleming and his brother stopped at the Time Saver Liquor Store. Kelly Hamlin and Barbara Fleming went to the Time Saver Grocery Store, next door to the liquor store, to buy ice cream for the children. As they were leaving, they saw John Wortham sitting in a car with Bertram "Sugar" Price. Wortham screamed profanities at Kelly and told her to come to the car and talk to him. When she refused, Wortham got out of the car and hit her on the head several times with a bottle of liquor. Tom Fleming and another man pulled Wortham away. Wortham returned to the car, and Hamlin, Barbara Fleming, and the children returned to the basketball courts.

Hamlin arrived at the courts crying hysterically. She told Balentine what had happened, and showed him the bleeding wounds on her head. Balentine, Hamlin, their children, and Barbara Fleming got into a car driven by Barbara Fleming. Balentine did not have a car of his own. Fleming and Balentine dropped Hamlin and the children off at a friend's house, then continued on to the Time Saver Liquor Store so that Balentine could, he testified, "ask him [Wortham] what happened." At this time, Balentine was unarmed. Upon arrival in the area of the liquor store, Balentine asked a number of people about what had happened. Balentine testified that various people told him that Wortham was armed and had made threats toward him.

Evidence was presented that Wortham had a reputation for extremely violent behavior. At trial a number of witnesses testified to Wortham's reputation for senseless violence. Balentine was aware of Wortham's reputation. Balentine testified he was personally familiar with an incident where Wortham assaulted and beat up several innocent victims, and that he had heard of other incidents involving Wortham. In addition, Balentine testified that he knew that Wortham was with Bertram "Sugar" Price and that Price was known to carry a gun.

During the course of the day, Balentine picked up a shotgun that a friend had left at his home. He testified he intended to carry it for protection as he picked up his family to escort them home. Some time

later, Balentine encountered Wortham near the Time Saver Liquor Store.

The fatal shooting of John Wortham followed. As Balentine characterized the shooting, he merely approached Wortham to discuss Wortham's earlier assault of Hamlin. He was carrying the shotgun, but did not plan to shoot Wortham. Wortham responded aggressively, shouting profanities and moving toward Balentine. Wortham quickly turned partially and reached behind his back. Balentine, concluding that Wortham was preparing to draw a gun and shoot him, shot Wortham.

The witnesses to this incident included the Flemings, who were in the car in which Balentine arrived, and Diane Janson who, along with Bertram Price, was in the car in which Wortham arrived. The Flemings' testimony supported Balentine's contention that it appeared Wortham was reaching for a gun. From Janson's testimony, it appeared more likely that Balentine was the aggressor. Price did not testify.

## I. WHETHER THE TRIAL COURT ERRED IN REFUSING TO ADMIT THE HEARSAY STATEMENT OF PRICE.

Just prior to the shooting, Wortham arrived at the Time Saver Liquor Store in Price's car, along with Price and Janson. Janson testified at trial that Wortham left the car to get some beer. She testified that she heard Wortham shouting and saw him duck down in front of the car *before* he was shot, indicating evasive action. This testimony was contrary to the statement she had given to police on the evening of the incident, in which she indicated the shot preceded Wortham's ducking in front of the car.

The shooting occurred around 8:00 p.m. Price spoke with the police at about 8:40 or 8:50 p.m. at the hospital, and a police report was prepared based on that interview. A similar taped statement was taken at 10:00 p.m. Price was unavailable to testify despite extensive defense attempts to locate him and compel his presence. The state stipulated to his unavailability.

The defense sought to introduce evidence of Price's statements to show that Wortham was shot before he ducked down in front of the car, both for its substantive value and to impeach Janson's trial testimony. The relevant portion of the police report summary of Price's 8:40 statement reads as follows:

> Price said that he did not hear the shot fired because he had his stereo playing very loud. Price said that he turned in his seat to talk to Janson who was seated in the back of the vehicle behind the driver. He said that Wortham ran up to the vehicle on the right side and said that he had been shot and then Wortham had continued around the vehicle counter clockwise around the front of the vehicle, around the side and back around to the right side of the vehicle. Price said that he did not see much of the activity from the vehicle at this time because he was crouching down in his seat to avoid being shot himself. He said that he noticed Wortham fall back away from the vehicle and he got out and another individual by the name of Sammy helped him place Wortham into the back seat of his vehicle and he drove away from the scene to take Wortham to the hospital at Humana Emergency Room.

It is undisputed that the evidence the defense sought to have admitted was hearsay as defined by the Alaska Rules of Evidence. A.R.E. 801. Hearsay evidence is generally not admissible unless it falls within a recognized hearsay exception. A.R.E. 802. Evidence Rule 803 provides exceptions to the general rule. Under the exceptions to Evidence Rule 803 the availability of the declarant as a witness is immaterial. One such exception, the "present sense impression," is defined by the evidence rules as follows:

> *Present Sense Impression.* A statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter.

A.R.E. 803(1).

The trial court found that Price's statement did not fall within this exception, and

refused to admit it into evidence. Balentine argues on appeal that the trial court erred in ruling that Price's statement was not admissible under A.R.E. 803(1).

■ The admissibility of evidence is largely within the trial court's discretion, and will not be overturned absent an abuse of discretion. *Hawley v. State*, 614 P.2d 1349, 1361 (Alaska 1980). The parties to this appeal disagree as to whether the time lapse here does or does not qualify as "immediately thereafter" under the present sense impression exception. Both discuss the policy reflected by the rule: that contemporaneity is often indicative of veracity. The appellant characterizes the "event" as including Price driving Wortham to the hospital, cutting the time lapse considerably from the 40–50 minutes of the state's characterization, which reflects time elapsed from the shooting. Balentine cites cases indicating that no *per se* rule regarding time elapsed can be drawn under the exception; these same cases approved admission of evidence under the exception which were uttered after a half-hour interval. *See, e.g., State v. Whyde*, 30 Wash. App. 162, 632 P.2d 913 (Wash.1981) ("excited utterance" exception to hearsay rule).[1] The state, on the other hand, cites cases denying admissibility after similar spans of time. *See, e.g., Hilyer v. Howat Concrete Co.*, 578 F.2d 422, 426 n. 7 (D.C.Cir.1978).

■ As this debate illustrates, the rule leaves much room for subjective application. It was within the trial court's discretion to conclude that, under the facts of this case, the immediacy of Price's statement was not so great as to suggest the reliability of the statement. The trial court did not abuse its discretion in refusing to admit the statement under this exception to the hearsay rule.

■ We recognize that there are occasions when evidence rules must give way to due process considerations, so that evidence properly excludable under the rules of evidence must nonetheless be admitted to protect the constitutionally granted trial rights of the defendant. *See, e.g., Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974); *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). "If the superior court's refusal to admit [the hearsay evidence] did, in fact, substantially limit [the defendant's] opportunities to prove his innocence affirmatively, the due process right to a fair trial would have been denied him." *Keith v. State*, 612 P.2d 977, 982–83 (Alaska 1980). We do not believe exclusion of Price's statement substantially affected Balentine's ability to present his defense. As the trial court pointed out, Price's statement, even if taken at face value, was of little help to the defense. Further, the court found reason to doubt the reliability of Price's statements, given Price's apparent efforts to avoid testifying in or getting involved in this case. Thus, the exclusion of the hearsay statement does not raise a constitutional issue.

II. WHETHER BALENTINE WAS ERRONEOUSLY AND UNCONSTITUTIONALLY DENIED DISCOVERY OF CERTAIN "CRIME STOPPERS" RECORDS.

Calls to the "Crime Stoppers" program provided some information used in the investigation of this case. The Crime Stop-

---

**1.** Alaska Rule of Evidence 803(2) provides that "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition" is not excluded by the hearsay rule. Balentine has not argued on appeal that Price's statement might be admissible under this hearsay exception. The analysis for whether to admit Price's statement under A.R.E. 803(2) is similar to the analysis of whether to admit the statement under A.R.E. 803(1). In *Lipscomb v. State*, 700 P.2d 1298, 1305–1308 (Alaska App.

1985) we discussed admission of evidence under Evidence Rule 803(2):

> A trial court's determination that a statement falls within the excited utterance exception to the hearsay rule necessarily depends on the facts peculiar to each case and should not be reversed on appeal unless clearly erroneous.

700 P.2d at 1306. In *Lipscomb*, we concluded that the trial court did not abuse its discretion in admitting the victim's report of a robbery. *Id.* at 1305.

pers program solicits information from the public concerning crimes under investigation, often offering monetary rewards for fruitful tips.[2] Anonymity is provided if the caller wishes. Anonymous callers are assigned numbers which they use to identify themselves in subsequent dealings with Crime Stoppers. The incoming phone calls are taken by the Anchorage Police Department, which prepares reports of conversations, and uses the information gathered in its investigations.

Prior to trial, Balentine sought discovery of all information relating to this case collected through Crime Stoppers. He moved to compel disclosure of both documentary records and tape recordings of all phone calls relating to his case. In an *ex parte, in camera* hearing, the trial court reviewed documents that the prosecution provided. The judge ruled that two sets of documents, Exhibits A and B, must be disclosed. The court did not require disclosure of two other sets of documents, Exhibits C and D. Also, disclosure of tapes was not ordered. A defense request for full discovery of these items was reiterated during the course of the trial, and again denied.

During the pendency of this appeal we granted the state's motion for a limited remand on the question of whether there were any tape recordings of Crime Stoppers phone calls related to this case. On remand, the parties entered into a judicially approved stipulation providing that no tape recordings of the phone calls were made, and that no such tape recordings exist. Thus, the only issue presented is whether the trial court erred in refusing to compel discovery of Exhibits C and D, after its *ex parte, in camera* review of these reports.

The judge's decision noted the semi-private nature of the program, but was primarily based on assessment of the value of the material to the defendant in preparing his defense, and of the law enforcement interest in maintaining confidentiality. The

judge concluded that the withheld documents did not contain information which would be of use to Balentine. On the other hand, he found that disclosure might very well adversely affect the rights and duties of citizens to report crime without being harassed.

■ The scope of discovery in criminal cases in Alaska is broad, as reflected in Alaska Rule of Criminal Procedure 16(a). However, the discovery rule itself requires a balancing between the policy of broad discovery and the needs of effective law enforcement:

> In order to provide adequate information for informed pleas, expedite trial, minimize surprise, afford opportunity for effective cross-examination, and meet the requirements of due process, discovery prior to trial should be as full and free as possible consistent with protection of persons, effective law enforcement, and the adversary system.

Alaska R.Crim.P. 16(a). The Alaska Supreme Court emphasized this theme in *Braham v. State*, 571 P.2d 631, 644 (Alaska 1977), *cert. denied*, 436 U.S. 910, 98 S.Ct. 2246, 56 L.Ed.2d 410 (1978), which points to the constitutional foundation of the policy:

> [T]he defendant is entitled to have access to all relevant evidence in the possession of the State in order that he be afforded his right to a fair trial. The question of whether he has a fair trial relates to Constitutional guarantees such as due process and the right to have compulsory process for obtaining witnesses in his favor. [Footnote omitted.]

■ Alaska Rule of Evidence 509(a) in creating a privilege for informant's identities specifically limits the broad discovery rule:

> The United States, the State of Alaska and sister states have a privilege to refuse to disclose the identity of a person who has furnished information relating to or assisting in an investigation of a

**2.** According to the affidavit of an Anchorage Police Department supervisor of the program, rewards are generally given for "arrest and in-

dictment" rather than for conviction or testimony.

possible violation of law to a law enforcement officer or member of a legislative committee or its staff conducting an investigation.

A.R.E. 509(a). This rule protects only the identity of an informant, and not the information he or she provides. *See Roviaro v. United States*, 353 U.S. 53, 60, 77 S.Ct. 623, 627, 1 L.Ed.2d 639, 644–45 (1957) ("where the disclosure of the contents of a communication will not tend to reveal the identity of an informer, the contents are not privileged"). Also, to the extent this privilege denies the constitutionally guaranteed trial rights of a defendant, it may not be applied. *See Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974) (defendant's constitutional confrontation right required disclosure of primary prosecution witness' juvenile probation status, despite court rule barring disclosure of juvenile record); *Salazar v. State*, 559 P.2d 66, 79 (Alaska 1976) ("when conflict is found between the constitutional right of confrontation and the exercise of a privilege based on public policy, the constitutional right must control") (involving marital privilege).

The supreme court examined the issue of when information concerning an informant may be withheld from the defense in *Braham v. State*, 571 P.2d at 631. *Braham* was convicted of attempted first-degree murder for hiring Koelzer to murder an associate of Braham's. Before Koelzer executed the "contract," state troopers confronted him. Koelzer agreed to cooperate with the troopers in collecting evidence against Braham. In exchange for his cooperation the troopers agreed to reimburse Koelzer at the same rate Braham had offered. At trial, Koelzer was the state's primary witness. Braham had sought pretrial discovery of the extent of Koelzer's relationship with the police in other matters. The trial court consented to the state's request to deny Braham information that Koelzer was employed as a frequent police informant. 571 P.2d at 641–42.

The supreme court found this limitation of discovery to be error, albeit harmless error since the essence of this information was elicited from Koelzer on cross-examination. *Id.* at 647–48. The court set forth the test for determining when nondisclosure of information is justified, as well as a procedure for judges to follow in making this determination:

> Non-disclosure was proper only if (1) the prosecution showed that discovery of the evidence would be inconsistent with protection of persons or enforcement of the laws and (2) the trial judge concluded that the material was not relevant to the defense. If the district attorney failed to show that disclosure would harm enforcement or protection efforts, the material must be disclosed. The question of relevance would then be decided in an adversary context; both counsel would have the opportunity to make their respective arguments.
>
> Disclosure is also required if the judge's in camera inspection showed that the material was relevant to the defense—whether or not the prosecutor had demonstrated that discovery would be inconsistent with enforcement or protection efforts. In the latter circumstance, the state must decide between continuing to prosecute, while incurring the problems posed by disclosure, and terminating the prosecution in order to maintain the material's secrecy.

*Id.* at 643 (footnotes omitted).

The United States Supreme Court applied a similar approach in the context of a claim of the informant identity privilege in *Roviaro v. United States*, 353 U.S. at 60–62, 77 S.Ct. at 627–29, 1 L.Ed.2d at 645–46. More recently, this approach was used in balancing the criminal justice system's need for relevant recorded information against the President of the United States' claim of executive privilege. *United States v. Nixon*, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974).[3]

---

**3.** Balentine cites *Nixon* in his favor, since in that case the court found the ends of criminal justice prevailed over a claim of executive privilege, at least where no "state secrets were claimed to be

In *Schmid v. State*, 615 P.2d 565 (Alaska 1980), a case involving disclosure of an informant's identity, the court followed the *Roviaro in camera* balancing approach. 615 P.2d at 573. Similar procedures were approved and followed in *Spencer v. State*, 642 P.2d 1371, 1374–76 (Alaska App.1982) (*in camera* inspection of mental records of estranged wife of defendant, who was primary state witness, where defendant sought discovery of records); *Fox v. State*, 685 P.2d 1267, 1272–73 (Alaska App.1984) (*in camera* inspection of juvenile record of victim of alleged sexual assault who was primary state witness, where defendant sought discovery of juvenile records for impeachment purposes); and *Morrell v. State*, 575 P.2d 1200, 1205–06 (Alaska 1978) (*in camera* review of journal of victim of alleged kidnapping/rape, where defendant sought disclosure of entire journal).

In the present case, the trial court followed the correct procedure in inspecting the Crime Stoppers materials to assure that no documents were withheld unless the prosecutor showed that disclosure would harm enforcement or protection efforts and that the documents were not relevant to the defense. The trial judge did not find all Crime Stoppers materials undiscoverable *per se*. Rather, each item was reviewed individually in light of the dual criteria of the *Braham* test. Two packets of Crime Stoppers reports were, in fact, ordered disclosed.

at stake." Balentine's reliance on this case is misplaced. While the result in that case favored the needs of the criminal justice system over the interest of the claimant of the privilege, the process approved was essentially that suggested in *Braham* and utilized by the trial court in the present case. The trial judge was to review the material sought *in camera*, and exclude portions which were not relevant or not admissible. 418 U.S. at 711–716, 94 S.Ct. at 3109–11, 41 L.Ed.2d at 1066–68.

4. Our conclusion that the court did not err in refusing to compel discovery of the contested materials is in no part based on the quasi-public nature of the Crime Stoppers program, which receives much of its funding from private donations. Criminal Rule 16(b)(4) provides:

We have reviewed the withheld documents, and agree with the trial court's conclusions.[4] We recognize that protecting the identity of those who assist law enforcement officials is often of great importance to the protection of persons, and to enforcement of the laws. Each of the withheld reports contains information which might jeopardize the anonymity of a person providing information to police through the Crime Stoppers program. This, in turn, could jeopardize the continued effectiveness of Crime Stoppers. The information contained in these reports is not relevant to Balentine's defense. The court's decision not to compel disclosure of these items did not substantially impair the fairness of Balentine's trial, or otherwise impermissibly infringe upon his constitutionally-protected trial rights.

III. WHETHER THE TRIAL COURT ERRED IN REFUSING TO INSTRUCT THE JURY ON THE LAW OF IMPERFECT SELF-DEFENSE.

Balentine argues that the trial court should have instructed the jury that if one causes death using deadly force under the unreasonable belief such force is necessary to prevent imminent death or serious bodily injury, he is guilty of manslaughter, and not murder. The Alaska Revised Criminal Code, enacted in 1978 and taking effect in January, 1980, originally recognized such a defense, under former AS 11.41.115(d). The legislature repealed this provision,

(4) *Information Within Possession or Control of Other Members of Prosecuting Attorney's Staff.* The prosecuting attorney's obligations extend to material and information in the possession or control of
(i) members of his staff, and
(ii) any others who have participated in the investigation or evaluation of the case and who either regularly report or with reference to the particular case have reported to his office.
Certainly subsection (ii) encompasses Crime Stoppers, which is staffed by police officers who, as a matter of standard procedure, investigate and report to the prosecuting authorities.

however, the following commentary accompanied the repeal legislation:

> This amendment repeals two provisions in the criminal code. The first is AS 11.41.115(d) which provides that an unreasonable but honest belief as to the circumstances giving rise to a defense of justification (e.g., self-defense) will mitigate what otherwise would be murder to manslaughter. This section was not recommended by the Criminal Code Revision Committee but was added by the legislature subsequent to a discussion during committee consideration that it correctly stated the applicable law in Alaska.
>
> In a recent decision, *Houston v. State*, [602] P.2d [784]. Op. No. 1970 (Nov. 16, 1979) the Alaska Supreme Court noted that the law in effect in Alaska at the time did *not* recognize the defense of unreasonable belief as to the justification. The effect of the repeal of AS 11.41.115(d) is to make the code consistent with the law that existed prior to January 1, 1980 and to provide that only *reasonable* beliefs as to the right of justification would excuse what would otherwise be a murder....

Senate Journal Supp. No. 44 at 27 (May 29, 1980) (Emphasis in original).

Balentine argues that the legislature misread *Houston*, and mistakenly repealed the provision in order to keep the statutory scheme in line with the common law. He urges this court to rectify this error by recognizing imperfect self-defense as a viable common law doctrine.[5]

Balentine makes a strong argument that the legislature misread *Houston* or interpreted it too broadly. There is strong support for the proposition that the partial defense of imperfect self-defense was available at common law. The Alaska cases in this area are not clearly to the contrary. Nonetheless, the legislative activity and commentary in this area make clear the legislature's intent to eliminate imperfect self defense as a partial defense.

■ We also find no support in the case law for Balentine's contention that one who kills under the actual but unreasonable belief that deadly force was necessary to prevent imminent death or serious bodily injury has *per se* acted with too small a degree of recklessness to be guilty of murder rather than manslaughter. We decline to accept that position as a matter of law. Therefore, the trial court did not err in declining to instruct the jury concerning imperfect self defense.

IV. WHETHER THE TRIAL COURT ERRED IN INSTRUCTING THAT THE JURY COULD NOT CONSIDER LESSER INCLUDED OFFENSES UNLESS THEY FIRST UNANIMOUSLY FOUND THE DEFENDANT NOT GUILTY OF THE GREATER CHARGE.

■ An argument identical to that raised by Balentine was recently discussed and rejected by this court in *Dresnek v. State*, 697 P.2d 1059 (Alaska App.1985), *petition for hearing granted*, (Alaska, July 15, 1985). *Dresnek* is controlling here.

Balentine's conviction is AFFIRMED.

---

**5.** Alaska Statute 01.10.010 provides:

*Applicability of common law.* So much of the common law not inconsistent with the Constitution of the State of Alaska or the Constitution of the United States or with any law passed by the legislature of the State of Alaska is the rule of decision in this state.