**Christopher M. HOWELL, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. A–5333.**

Court of Appeals of Alaska.

May 31, 1996.

David M. Seid, Assistant Public Defender, Ketchikan, and John B. Salemi, Public Defender, Anchorage, for Appellant.

James L. Hanley, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before BRYNER, C.J., and COATS and MANNHEIMER, JJ.

## OPINION

BRYNER, Chief Judge.

Christopher M. Howell was convicted by a jury of first-degree murder. Superior Court Judge Thomas E. Schulz sentenced Howell to sixty-five years with fifteen years suspended. Howell now appeals his conviction, the

denial of his motion for judgment of acquittal or new trial, and his sentence. We reverse.

On the night of February 19, 1992, Howell shot and killed George Michael Church. The shooting occurred just outside a trailer Howell shared with his girlfriend, Frankie Peterson, in a trailer park in Thorne Bay, Alaska. As a result of the shooting, Howell was charged with murder in the first degree, in violation of AS 11.41.100(a)(1)(A).[1]

At trial, the state sought to prove that Howell and Church had been engaged in an argument at Howell's trailer just before the shooting, that Church left the trailer, got into his truck, and began to drive away, but that Howell, still upset over the argument, picked up his rifle and fired two shots as Church headed toward the trailer park's exit. The first shot grazed Church's forehead; the second struck him in the back of the neck, near the base of his skull, severing his spine and killing him.

To prove its case, the state relied primarily on the testimony of two couples who were neighbors of Howell: Terry and Carol Smith, and Nancy and Charles Bish. Their description of the events leading up to the shooting and of the shooting itself can be briefly summarized. At about 9:30 on the night of the shooting, Church's truck, a loud black Chevy pickup, dropped Frankie Peterson off at the trailer park. Peterson appeared to be drunk. Between 11:00 and 11:30, the same loud truck again stopped in front of Howell's trailer; Howell, Church, and Peterson got out. They talked loudly, possibly arguing, until a neighbor yelled at them to be quiet.[2]

Howell, Church, and Peterson remained together at the trailer for about 45 minutes to one hour. The neighbors heard arguing and a gunshot from within the trailer. Charles Bish ventured outside his own trailer to record the truck's license plate number after hearing the gunshot. He peeked into Howell's window and saw Howell, Peterson, and Church, sitting at the kitchen table, not arguing. Several times after this gunshot, Church left Howell's trailer, got into his truck, and revved his engine; he then returned to the trailer, at least once banging on the door to get in.

At about 10 or 15 minutes after midnight, all four neighbors heard and/or saw Church leave the trailer, get into his truck, and begin driving. As Church left, Howell said, "This isn't over yet—you can't leave." Church's truck had been parked facing away from the trailer park entrance, toward the end of the trailer park's road. Church drove to the end of the road, turned around, and headed slowly toward the park's entrance, a maneuver that brought him by Howell's trailer again. As the truck passed Howell's trailer, Nancy Bish heard two shots; the Smiths and Charles Bish heard two or three.

Nancy Bish was the only witness who actually saw the shooting. According to her, after Church left Howell's trailer, Howell "opened up his trailer door and [Peterson] screamed 'No, don't do that, leave that here.' And when he shut the door he had a rifle in his hand." When Church's truck passed back by the trailer, Howell "raised the rifle and he shot." "Then ... he took a step and he steadied his two feet here and he pointed the rifle again and shot again." The truck rolled to a stop; Church was dead.

In response to the state's evidence, Howell claimed self-defense. Howell testified that on the afternoon and early evening of the shooting he and Frankie Peterson had spent their time relaxing, drinking and watching TV with Church and several other people at the Leslie Cutting bunkhouse. By 9:00 p.m., the members of the group were evidently intoxicated. Howell eventually left the bunkhouse and walked down to the local dock, where, according to Howell, he met a man who threatened him with a gun. Howell ran away; as Howell ran, the man fired several shots at him. Howell was badly frightened.

---

**1.** Howell was also charged with three counts of assault in the third degree as a result of his post-shooting actions. Howell was acquitted of these charges.

**2.** According to Nancy Bish, as Peterson and Howell went inside, Peterson told Howell to "stop it" and to "leave her alone"; Peterson pushed Howell off the trailer's steps and onto the ground. Carol Smith, however, testified that she heard Peterson tell Church to leave them alone, go away, and get out of there.

He was convinced that the man who had fired at him was a drug dealer who would hunt him down and kill him. Howell ran back to the bunkhouse, called his boss, James Leslie, and told Leslie about the incident, saying that he was too frightened to go home or call the police. Eventually, Howell agreed to return to his trailer.

Howell arrived home shortly after 10 p.m. Peterson was already there. Howell grabbed both of his guns, gave one to Peterson, and tried to get her to lie on the floor with him. She accused him of being drunk, discounted his story, and tried to leave. He finally forced her to lie on the floor with him; once on the floor, Howell fell asleep. He awoke some time later and heard several men outside yelling. Fearing it was the man who had shot at him earlier, he fired a warning shot through a closed window. After the shot, Howell heard Peterson saying that she and Church were outside—until that point Howell had not realized that Peterson was no longer in the trailer.

Howell told them to come in. Church said that he had come to the trailer park because he was worried about Peterson. Howell replied that there was no need to worry; he was not the type to hurt her. Howell then began to describe the incident at the dock. Church and Peterson were skeptical and said they believed that no one had shot at Howell. After a while, Church began "taunting" Howell. He told Howell that he loved Peterson and that she was too good for Howell. Howell replied, "Fuck you, you're drunk." This angered Church, who, according to Howell,

> blew up, I mean it went from like instant Doctor Jekyll/Mr. Hyde; I mean he went "Fuck you, fuck you" [at the top of his voice], I mean spit just comes out of his mouth and he comes out and I stood up and he come at me, he pushed me up against the wall and I stick my leg behind him and I push him off me, and I get right on him. And he scared me, he was—he went down and I was right on him, I mean just—I was right on him and I got right over him, I held on to his shoulders right here so he couldn't swing, and I was straddling him, and I got down like this so he couldn't knee me in the groin.

After Church stopped struggling, Howell let him up. Howell then told Church, "I don't care what you believe, I know what happened down at the docks. All you're doing is getting me riled up and ... we're not getting anywhere. Why don't you just go home." Church went outside, but did not leave. About five minutes later he came back and banged on the door. Howell let him in. Church said, "Just forget it ever happened, just forget the whole thing."

Howell claimed that this statement made him suspicious; he began to fear that Church was trying to protect "his friends"—an apparent reference to the gun-wielding stranger at the dock. Howell told Church he just could not forget about someone trying to kill him and that he did not think it was over yet. Church continued to say "Forget it." Howell continued to say he could not. Church went to his truck; Howell followed him outside, saying, "I don't care what you believe, ... I don't think this is over yet." Church turned and gestured toward Howell like he was a lost cause. Church then got into his truck and drove away from Howell's trailer.

Howell testified that, at this point, he sensed something was wrong—that someone might be watching him—so he got his rifle. Church had stopped at the far end of the trailer park driveway with his dome light on; Howell thought that he was getting a cigarette or something. Then Church turned around and began driving slowly toward Howell's trailer and the trailer park exit. As Church passed by, Howell heard gunfire and thought that Church had tried to shoot him:

> I'm standing just like this ... and he's coming back up, he's driving slow, and as soon as the pickup gets right here a shot sounds out, I mean it's close, I could feel the concussion (sic) and I—throw myself away from the shot and I pull up and I just shoot, I just throw myself and I land on the trailer and I shoot like that, and I run after him and I get up like this, I run after him .... and he just made that jog like he was going to get ready for a U-turn, I mean he shifted into that next lane, I mean he was already in the incoming lane as he was going out but he shifted into the next lane over ... like he's getting room for a

U-turn ... and that's when I shot. I didn't want to shoot but I didn't want him coming back either. I actually believed that he was shooting at me.

Based on this and other defense evidence,[3] Howell requested and was granted an instruction on self-defense. Howell additionally requested an instruction on heat of passion. In support of this request, Howell pointed out that fear is an emotion included within the heat of passion defense. Citing the evidence of Church's disagreement with Howell immediately before leaving Howell's trailer, the shots fired at Howell earlier that night, Howell's fear that Church was trying to protect whoever had fired the prior shots, and "the incoming shot that [Howell] felt," Howell argued that the jury could find that he had acted out of fear (and therefore in the heat of passion), even if it rejected his self-defense claim.

The trial court rejected Howell's argument, observing that "[w]hatever dispute those two had was over with and Church was leaving. And I don't think you can make a heat of passion argument legally on that set of facts." The trial court believed that, under these circumstances, the only potentially viable justification for Howell's shooting of Church was Howell's testimony that he "felt a muzzle blast" and acted in self-defense. For this reason, the court declined to instruct the jury on heat of passion.

On appeal, Howell challenges this ruling. Arguing that his claim of heat of passion was supported by sufficient evidence and was not inconsistent with his claim of self-defense, Howell contends that the trial court erred in refusing his proposed heat of passion instruction.

Alaska law recognizes heat of passion as a defense to certain forms of first- or second-degree murder. The defense is described in AS 11.41.115(a), which provides that in a prosecution for either of these crimes, "it is a defense that the defendant acted in a heat of passion, before there had been a reasonable

opportunity for the passion to cool, when the heat of passion resulted from a serious provocation by the intended victim." Under AS 11.41.115(e), heat of passion is only a partial defense: a successful claim of heat of passion cannot absolve the defendant of guilt but will only reduce a homicide from first- or second-degree murder to manslaughter.

■ As used in the heat of passion statute, "serious provocation" means

conduct which is sufficient to excite an intense passion in a reasonable person in the defendant's situation, other than a person who is intoxicated, under the circumstances as the defendant reasonably believed them to be; insulting words, insulting gestures, or hearsay reports of conduct engaged in by the intended victim do not, alone or in combination with each other, constitute serious provocation.

AS 11.41.115(f)(2). We have consistently recognized that, in the context of the heat of passion statute, the word "passion" encompasses more than anger or rage; it includes fear, terror and other intense emotions. *Ha v. State*, 892 P.2d 184, 196 (Alaska App.1995) (citing *LaPierre v. State*, 734 P.2d 997, 1001 (Alaska App.1987)). *See also Blackhurst v. State*, 721 P.2d 645, 648 (Alaska App.1986); *Kirby v. State*, 649 P.2d 963 (Alaska App. 1982).

In keeping with its designation as a partial, rather than a complete defense to murder, "heat of passion does not require that the act of killing be reasonable, for a reasonable killing is no crime." *Ha*, 892 P.2d at 197 n. 6. In this respect, heat of passion differs markedly from self-defense, which completely justifies the use of deadly force, but only when the defendant's use of force is objectively reasonable—that is, when the defendant "reasonably believes the use of deadly force is necessary for self defense against death, serious physical injury, [or one of several listed felonies]." AS 11.81.335(a)(2).

**3.** Other evidence presented by the prosecution and defense need not be discussed for purposes of this appeal. It should be noted, however, that Frankie Peterson testified as a prosecution witness. To a large extent, Peterson was unable to recall the events leading up to the shooting— evidently due to her intoxication during that night. What Peterson did recall partly corroborated the testimony of the Smiths and the Bishes; partly, it corroborated Howell's version.

■ This is not to say that heat of passion can be established by a mere showing of subjective fear. The wording of AS 11.41.115(a) makes the heat of passion defense applicable only when the defendant is provoked "by the intended victim[.]" Furthermore, while the act of killing need not itself be reasonable, the concept of reasonableness plays a factor in determining whether a given defendant's emotional condition qualifies as "passion." The defense applies only if the defendant's passion results from "serious provocation." AS 11.41.115(a). As this term is defined in AS 11.41.114(f)(2), the existence of serious provocation must be determined through the eyes of a reasonable (and sober) person standing in the defendant's shoes:

> [I]t is not sufficient that the defendant experience heat of passion. Under AS 11.41.115(f)(2), the defendant's passion must be caused by "conduct ... sufficient to excite an intense passion in a reasonable person in the defendant's situation[, other than a person who is intoxicated,] under the circumstances as the defendant reasonably believed them to be." Moreover, under AS 11.41.115(a), the defendant's use of force must occur "before there [was] a reasonable opportunity for the [defendant's] passion to cool."

*Ha*, 892 P.2d at 197.[4]

■ To place the heat of passion defense in issue, a defendant need only produce "some evidence" to support the defense. AS 11.81.900(b)(15)(A). "In applying the some evidence test, neither the credibility of conflicting witnesses nor the plausibility of the accused's version is considered. So long as some evidence is presented to support the defense, matters of credibility are properly left for the jury." *LaPierre*, 734 P.2d at 1000 (citations omitted). Once there is "some evidence" of heat of passion in the record, the state bears the burden of disproving the defense beyond a reasonable doubt. AS 11.81.900(b)(15)(B). Either party may request the trial court to instruct the jury on the defense when some evidence supports it,

see *Blackhurst*, 721 P.2d at 647; upon request, the trial court must ordinarily give the jury an appropriate heat of passion instruction. See *LaPierre*, 734 P.2d at 1000; *Kirby*, 649 P.2d at 968.

■ Viewing the record in the present case in the light most favorable to Howell, we conclude that sufficient evidence of heat of passion was presented below to meet the some evidence test. Howell testified that he and Church had argued over whether Howell had been shot at earlier in the evening; by the time Church left, Howell was beginning to suspect that Church was involved with the drug-dealers at the dock. Howell also testified that, shortly before the shooting, Church had attacked him physically and that he had fought with Church over Howell's treatment of his girlfriend, Peterson. Testimony of Howell's neighbors established that Howell was still visibly upset and arguing with Church when Church left Howell's trailer and got into his truck. Even more significant is Howell's testimony that, as Church drove past, he felt and heard a bullet fly by his head. Two of Howell's neighbors testified that they heard two or three shots fired after Church had gotten into his truck—testimony consistent with Howell's claim that one shot was fired immediately before he fired twice at Church.

In opposition to Howell's heat of passion argument, the state points out—as Howell himself acknowledges—that the post-shooting investigation in this case conclusively established that Church was unarmed and could not have fired at Howell from his truck. Thus, according to the state, even if Howell thought he heard a shot, and even if the shot induced intense terror or fear that might qualify as heat of passion, "[t]here was simply no evidence of 'serious provocation' by Church, other than Howell's mistaken and unreasonable belief that Church shot at him." The state argues that Howell was barred from claiming heat of passion because "no reasonable juror could have found 'serious provocation' by the victim." The state goes on to argue that all prior Alaska cases find-

---

4. We have also recognized an element of proportionality implicit in the heat of passion statute's requirement that provocation be "serious."

*Roark v. State*, 758 P.2d 644, 647–48 (Alaska App.1988).

ing sufficient evidence to justify a heat of passion instruction have involved situations in which "the deceased *actually* committed some serious act against the defendant."

These arguments call into question the meaning of the heat of passion statute's requirement that a defendant's passion resulted from "serious provocation by the intended victim." AS 11.41.115(a). As we have already noted, AS 11.41.115(f)(2) defines "serious provocation" by reference to an objective standard of reasonableness; under this provision, the pertinent inquiry is whether the defendant's passion was triggered by "conduct which is sufficient to excite an intense passion in a reasonable person in the defendant's situation, other than a person who is intoxicated, under the circumstances as the defendant reasonably believed them to be[.]" In requiring "serious provocation" to be caused "by the intended victim," AS 11.41.115(a) is ambiguous, for it fails to specify whether the issue of who caused the defendant's heat of passion must be determined by the reasonable person standard specified in AS 11.41.115(f)(2)'s definition of "serious provocation."

On its face, the statutory language leaves room for argument that the phrase, "by the intended victim" should be construed to mean heat of passion can be claimed only when the intended victim actually engaged in serious provocation. The state seems to assume that the language should be so construed. Yet the statutory language also leaves ample room for argument that subsections (a) and (f)(2) should be read together and construed to allow "serious provocation by the intended victim" to be based on the defendant's reasonable belief—in other words, to allow heat of passion to be claimed when a reasonable person in the defendant's situation would have concluded that the victim engaged in an act of serious provocation.

When we look beyond the face of the heat of passion statute, we find that this ambiguity must be resolved in favor of the latter construction, not the former. Alaska Statute 11.15.115 was adopted in 1978, as part of Alaska's revised criminal code. In enacting the heat of passion statute, the legislature indicated its intent to "codif[y] the 'heat of

passion' defense to murder." Apart from pointing out that the heat of passion statute defined "serious provocation" in a manner that would "preclude consideration of whether the defendant was intoxicated[,]" the legislature made no mention of changing the traditional scope of the defense. *See* Senate Journal Supp. No. 47 at 11–12, 1978 Senate Journal.

The legislature based the language of AS 11.41.115 on the heat of passion statute recommended to it by the Criminal Code Revision Commission in February 1977. *See* Alaska Criminal Code Revision, Part I, at 18–20 (Tent. Draft 1977). In particular, the "by the intended victim" requirement embodied in subsection (a) of AS 11.41.115 tracks verbatim the language embodied in the Tentative Draft's § 11.41.110(b). In commenting on the Tentative Draft's heat of passion provision, the Commission made clear its intent to adopt the traditional approach to the defense:

> The [Tentative Draft's heat of passion] defense is a restatement of the common law doctrine of "voluntary manslaughter" which has been recognized and codified in most American jurisdictions and recognized, but not codified, in Alaska. The doctrine provides that murder is reduced to manslaughter by a mitigating factor variously termed "heat of passion," "sudden passion," "provocation," and the like. The theory of the principle is one of extending a degree of mercy to a defendant who, though intending to kill, acted after a serious provocation in a heat of passion rather than in "cold blood".

Alaska Criminal Code Revision, Part I, at 30 (Tent. Draft 1977).

Under common law, as in Alaska's statute, the defense of heat of passion required an act of provocation by the victim; but this requirement was deemed satisfied so long as the defendant reasonably believed that the victim had engaged in provocative conduct: "Traditionally, the ... decisions usually required that the provocation arise from some action of the deceased or at least that the defendant reasonably so believe." *Model Penal Code & Commentaries* Part II, Art. 210, § 210.3, p. 57 (1980). Professor LaFave ad-

dresses this "rare and rarely addressed" issue as follows:

> Sometimes the defendant intentionally kills another in a reasonable, but erroneous, belief that the victim has injured him. It would seem that the provocation is adequate to reduce the homicide to voluntary manslaughter if the killer reasonably believes that the injury to him exists, though actually he has not been injured. In other words, a man's passion directed against another person suffices for manslaughter if (1) he reasonably believes that he has been injured by the other, and (2) a reasonable man who actually has suffered such an injury would be put in a passion directed against the other. But this issue is rare and rarely addressed even in modern manslaughter statutes.

2 Wayne R. LaFave & Austin W. Scott, Jr., *Substantive Criminal Law*, § 7.10(b)(9) at 659 (1986) (footnotes omitted).

Two vintage cases support LaFave's discussion: *State v. Michael*, 74 W.Va. 613, 82 S.E. 611, 614 (1914) (if defendant believed man standing near provoker was acting in concert with provoker, it was only manslaughter to kill bystander); *State v. Yanz*, 74 Conn. 177, 50 A. 37, 39 (1901) (defendant guilty only of manslaughter if he kills man appearing to be engaging in adultery with his wife, if defendant is reasonably mistaken). The state cites no contrary authority, and our own research of case law from jurisdictions having heat of passion statutes comparable to Alaska's has disclosed no more recent cases definitively accepting or rejecting a claim of reasonable mistake as to provocation by the victim.[5]

■ Considering the Alaska legislature's apparent intent to codify the traditional doctrine of heat of passion, and considering further the sparse but clear authority indicating that the requirement of "provocation by the victim" could traditionally be met by evidence of a defendant's reasonable but mistaken belief that the victim had engaged in serious provocation, we conclude that the reasonable person standard set forth in AS 11.41.115(f)(2) governs the determination of whether that provocation was "by the intended victim," as required under AS 11.41.115(a).

■ Here, the jury heard Howell's testimony that, as Church's car passed by Howell, he heard a shot and felt a bullet go by his head. Three of Howell's neighbors who heard the incident testified that they heard two or three shots fired after Church had gotten into his truck—testimony potentially corroborating Howell's claim that he heard someone fire at him immediately before he fired twice at Church. Evidence was presented that Church had attacked Howell shortly before the shooting and that Howell was still visibly upset when Church left Howell's trailer and got into his pickup truck. Viewing the totality of the evidence in the light most favorable to Howell, we think that reasonable jurors could have found that Howell reasonably, albeit mistakenly, believed that Church committed an act of provocation by attempting to shoot him. The jury could thus have found an act of provocation "by the intended victim." AS 11.41.115(a). We further think that reasonable jurors viewing the evidence in the light most favorable to Howell could have found the provocation "serious": that Church's conduct, as seen from Howell's perspective, might have been found sufficient to "excite an intense passion in a reasonable person in [Howell's] situation, other than a person who is intoxicated, under the circumstances as

---

**5.** At least one recent decision, however, suggests in *dicta* that when a heat of passion statute requires provocation by the victim, the defendant's reasonable belief should govern in determining whether the victim engaged in any provocative conduct. *See Vuong v. State*, 830 S.W.2d 929, 938 (Tex.Cr.App.1992) (rejecting, under former Tex. Penal Code § 19.04(a), (b)—which required "provocation by the individual killed"—a heat of passion claim asserted by a defendant who had purportedly been threatened by gang members, since the court found "no indication in the record that Appellant believed, at the time of the murders, that either victim was a gang member[.]"). *Cf. Foster v. State*, 264 Ga. 369, 444 S.E.2d 296, 296 n. 2 (1994) (noting with apparent approval Model Penal Code commentary describing traditional view that provocation must arise from an action of the victim "or at least that the defendant [must] reasonably so believe[ ].").

[Howell] reasonably believed them to be." AS 11.41.115(c).

The state nevertheless argues that under the circumstances of Howell's case no heat of passion instruction was justified because the jury could not have found that Howell was reasonably excited to a heat of passion unless it also found that he acted reasonably in self-defense. Thus, in the state's view, instructing the jury on self-defense was sufficient. Conversely put, the state's argument is that failing to instruct on heat of passion was at most harmless error. The state posits that, by rejecting Howell's claim of self-defense, the jury necessarily found that Howell did not reasonably believe that Church shot at him. The state asserts that, in light of its finding that Howell did not reasonably believe Church had fired a shot, the jury could not rationally have concluded that a reasonable person in Howell's situation would have been provoked to a heat of passion.

The state's argument hinges on the validity of its own initial premise: that the jury's rejection of Howell's self-defense claim necessarily reflects its conclusion that Howell did not reasonably believe that Church had fired at him. This premise is not plausible under the specific facts of Howell's case. The evidence at trial indicated that Howell fired twice at Church: the first shot struck a glancing blow to the forehead; the second was the fatal shot, striking Church in the spine, just below his skull. Howell claimed that he fired the shots reflexively and in quick succession. But Nancy Bish presented a different version, one suggesting that Howell's conduct was far more deliberate. According to Bish, Howell paused after the first shot, repositioned himself, took aim, and shot again.[6]

During its final argument to the jury, the prosecution seized on Nancy Bish's description of the shooting to argue that Howell's second, fatal shot was not necessary, even if Howell reasonably believed that Church fired first. At one point, the state argued:

If you look at Christopher Howell's testimony, that's the only place that there is even any type of evidence of self-defense, and when you look at it closely even it doesn't apply to this case. The evidence proves beyond a reasonable doubt that he did not have to fire that second shot, the one that killed Mr. Church, there was no justification.

Later, the state returned to this theme:

But even if you accept the fact that a shot was fired that would explain why he shot the first time, but he doesn't offer an explanation of why he shot the second time, which was the shot that killed him. The truck was going away, going away slowly.

\*     \*     \*     \*     \*     \*

But the truck was driving away at that point. There was no reason whatsoever for Mr. Howell, under his own testimony, to fire the second shot. He ran after the trailer—I mean after the truck on his own. He ran after it and picked up the rifle and shot again.

It is apparent from this argument that the jury's refusal to find self-defense did not necessarily reflect its rejection of Howell's claimed belief that Church had fired at him. By accepting the state's argument, the jury could have found that Howell reasonably believed that Church had fired the initial shot; it could even have accepted Howell's claim of self-defense as to the first shot. The jury could nonetheless have reasoned that Howell was guilty because he did not reasonably believe it necessary to fire the second shot. Had the jury been instructed on the partial defense of heat of passion, and had it considered the defense in this context, it would not have had to find that Howell acted reasonably in firing the second shot. To the contrary, if the jury found that Howell had been provoked to a heat of passion by his reasonable perception that Church had tried to shoot him, the jury could have found Howell guilty of the lesser offense of manslaughter,

---

6. Bish testified that Howell "opened up his trailer door and [Peterson] screamed 'No, don't do that, leave that here.' And when he shut the door he had a rifle in his hand." He "raised the rifle and he shot." "Then ... he took a step and he steadied his two feet here and he pointed the rifle again and shot again."

even if it believed the second shot to be clearly unnecessary and unreasonable.[7]

We conclude, for these reasons, that the trial court erred in refusing Howell's request for a heat of passion instruction and that the error cannot be dismissed as harmless. This error alone, however, does not necessarily entitle Howell to an outright reversal of his first-degree murder conviction, since at most the error prevented the jury from convicting Howell of the lesser offense of manslaughter. Accordingly, although Howell's first-degree murder conviction must be vacated, the state should be given the option on remand to choose between a new trial on the first-degree murder charge or entry of a judgment of conviction for manslaughter. *See LaPierre,* 734 P.2d at 1001–02.

The possibility that the state may request entry of judgment for manslaughter requires us to consider other arguments raised by Howell that, if meritorious, would require acquittal or a new trial.

Howell claims that the trial court erred in allowing the jury to see autopsy photographs of the victim. The photographs were admitted during the testimony of the state's pathologist, Dr. Michael Stewart, who de-

---

7. In connection with Howell's claim that terror or fear was the "passion" motivating his conduct in the present case, the state asserts that Howell's heat of passion argument is inconsistent with the legislature's express repeal of imperfect self-defense, formerly codified in AS 11.41.115(d) (a partial defense allowing conviction for the lesser offense of manslaughter in cases of first- or second-degree murder when the defendant acted under an honest but *unreasonable* belief that deadly force was necessary). *See generally Balentine v. State,* 707 P.2d 922, 929–30 (Alaska App.1985). In the state's view, Howell's heat of passion claim amounts to nothing more than a claim that he honestly but unreasonably believed it necessary to kill Church. The state's argument, however, oversimplifies the complex interplay of self-defense, heat of passion, and the now-abolished defense of "imperfect" self-defense.

A claim of self-defense to a charge of murder requires evidence that the defendant reasonably believed that use of deadly force was necessary to prevent infliction of serious physical injury or death. *See* AS 11.81.335(a)(2). Self-defense does not require proof that the defendant acted in the throes of intense passion; an act of self-defense can be committed coolly and deliberately. By contrast, a claim of heat of passion presupposes that the defendant has acted unreasonably on account of intense emotional excitement. AS 11.41.115(a), (f)(2). Heat of passion requires no evidence that the defendant believed, reasonably or unreasonably, that deadly force was necessary. As we pointed out in *Kirby v. State,* 649 P.2d 963, 968–69 (Alaska App.1982), self-defense and heat of passion have specific and differing requirements. A rejection of one ordinarily does not preclude the other.

Nevertheless, self-defense and heat of passion are alike in one important aspect: both require the defendant to perceive or react to reality in an objectively reasonable way. Self-defense requires that the defendant reasonably perceive the need for self-defense (and that the defendant act reasonably, based on that perception). Heat of passion, although it presupposes that the defen-

dant has acted unreasonably due to intense excitement, requires that the defendant's emotional response itself be reasonably based on a provocative event that the defendant reasonably attributes to the victim. This point of similarity—the requirement of an objectively reasonable basis in reality—distinguishes both self-defense and heat of passion from imperfect self-defense.

Under former AS 11.41.115(d), which defined imperfect (unreasonable) self-defense, an intentional homicide was mitigated to manslaughter upon proof that the defendant's act of killing stemmed from a genuine but unreasonable belief that it was necessary to use deadly force in self-defense. Imperfect self-defense was thus subjectively based: it did not require proof that the defendant's perception of or reaction to the situation was objectively reasonable; the defendant's crime would be mitigated even if the defendant's belief in the need for self-defense lacked any basis in reality. In this sense, imperfect self-defense differed significantly from normal self-defense and heat of passion, both of which require that the defendant's perceptions be reasonable. This distinction is underscored in the legislative commentary to ch. 102, § 3, SLA 1980, the enactment that abolished imperfect self-defense:

> The effect of the repeal of AS 11.41.115(d) is to make the Code consistent with the law that existed prior to January 1, 1980, and to provide that only *reasonable* beliefs as to the right of justification will excuse what would otherwise be a murder.

Senate Journal Supp. No. 44 at 27, 1980 Senate Journal (emphasis in the original).

The primary policy reflected in the legislature's abolition of imperfect self-defense appears to be the belief that no defense, whether complete or partial, should be available for conduct that is wholly unreasonable. Because heat of passion and normal self-defense both require the defendant to perceive or react to reality in an objectively reasonable way, while imperfect self-defense was entirely subjective, there is no inconsistency in continuing to allow homicide defendants to plead heat of passion even after the abolition of imperfect self-defense.

scribed Church's injuries and concluded that the second bullet caused Church's death. Howell objected to the photographs below as more prejudicial than probative. *See* A.R.E. 403. He renews this objection on appeal.

■ When gruesome photographs of a murder or assault victim are offered as evidence, the trial court is accorded considerable discretion in balancing their probative value against their potential for prejudicial impact. *See Miller v. State,* 778 P.2d 593, 598 (Alaska App.1989). Appellate decisions in Alaska have traditionally accorded broad deference to trial court decisions in this area; when genuine relevance has been established, we have consistently upheld trial court findings that evidence of this type is more probative than prejudicial. *See, e.g., Miller,* 778 P.2d at 598; *Ridgely v. State,* 705 P.2d 924, 932 n. 5 (Alaska App.1985) *rev'd on other grounds,* 732 P.2d 550 (Alaska 1987); *Valentine v. State,* 617 P.2d 751, 754 (Alaska 1980); *Sleziak v. State,* 454 P.2d 252, 261 (Alaska 1969); *Stevens v. State,* 443 P.2d 600, 604 (Alaska 1968); *Watson v. State,* 387 P.2d 289, 294 (Alaska 1963).

■ Here, by graphically illustrating the near-pinpoint accuracy with which Howell's bullets found their mark, the disputed photographs helped refute Howell's claim that he had fired twice in quick succession, reflexively, without taking aim and with no intention of killing. In the context of this murder prosecution, there was "nothing unusually gruesome, or repulsive, or horrifying about these photographs which would outweigh their evidentiary value." *Sleziak,* 454 P.2d at 261. We find no abuse of discretion.

■ Howell next argues that insufficient evidence was presented at trial to support his conviction for first-degree murder. Howell emphasizes that the evidence showed that he was intoxicated; he also emphasizes his uncontroverted testimony that he shot blindly and did not intend to kill. However, Howell's argument views the evidence in the light most favorable to his own case. When determining the sufficiency of evidence presented at trial, we must view the record and all inferences arising therefrom in the light most favorable to the state; we must find the

evidence, so viewed, sufficient if it would enable reasonable jurors to differ as to whether the state met its burden of proof beyond a reasonable doubt. *Simpson v. State,* 877 P.2d 1319, 1320 (Alaska App.1994).

■ In a case of homicide, intent " 'may be inferred from the circumstances attending the killing.' " *Gray v. State,* 463 P.2d 897, 904 (Alaska 1970) (quoting *Jordon v. United States,* 87 F.2d 64, 66 (D.C.Cir.1936)). "Nor does ... uncontroverted evidence of ... drinking afford a basis for questioning the sufficiency of the evidence on the issue of intent." *Simpson,* 877 P.2d at 1320. We conclude that ample evidence was presented to support an inference that Howell acted intentionally and to support his conviction for first-degree murder.

Relying on the same arguments, Howell alternatively claims that the trial court erred in denying his motion for a new trial on the ground that the verdict was contrary to the weight of the evidence. *See* Alaska R.Crim. P. 33; *Amidon v. State,* 565 P.2d 1248, 1262 (Alaska 1977). However,

> in reviewing a trial court's exercise of discretion upon a motion for new trial, [this court] must examine the record and determine whether "the evidence to support the verdict was completely lacking or was so slight and unconvincing as to make the verdict plainly unreasonable and unjust." If [this court] find[s] that "there was an evidentiary basis for the jury's decision," then the denial of a new trial must be affirmed.

*Amidon,* 565 P.2d at 1262 n. 44 (quoting *Sloan v. Atlantic Richfield Co.,* 541 P.2d 717, 724 (Alaska 1975)) (citations omitted). As we have already pointed out, ample evidence was presented below to support the jury's verdict. The trial court did not abuse its discretion in concluding that the verdict was not contrary to the weight of the evidence.

Howell lastly argues that the trial court erred in failing to grant a new trial based on prosecutorial interference with Howell's pretrial efforts to interview various witnesses. Howell's failure to raise this issue before the jury returned its verdict precludes review except for plain error. *Cf. Peschel v. State,* 770 P.2d 1144, 1150 n. 3 (Alaska App.1989);

*see also Owens v. State,* 613 P.2d 259, 263 (Alaska 1980). In ruling on Howell's claim of prosecutorial misconduct, the trial court found that Howell had failed to show prosecutorial misconduct. This finding is not clearly erroneous. Moreover, we note that Howell has neither claimed nor demonstrated any actual prejudice resulting from the alleged interference. We find no error, plain or otherwise.

Accordingly, Howell's conviction for first-degree murder is VACATED, and this case is REMANDED to the superior court. On remand, the state should be afforded the opportunity to elect either a retrial of the first-degree murder charge or entry of conviction for manslaughter.